COURT OF APPEALS OF VIRGINIA

Present:     Judges Humphreys, AtLee and Raphael
Argued by videoconference

MATTHEW G. MILLER

v.        Record No. 0646-22-1

MARY ANNE WADDELL,
  F/K/A MARY WADDELL MILLER                    MEMORANDUM OPINION* BY
                                               JUDGE RICHARD Y. ATLEE, JR.
MARY ANNE WADDELL,                             MAY 30, 2023
  F/K/A MARY WADDELL MILLER

v.        Record No. 0638-22-1

MATTHEW G. MILLER


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
John W. Brown, Judge

Kristi A. Wooten (Kenneth W. Jacobson; Jordan A. Fanney; Wooten
Law Group, PLC, on briefs), for Matthew G. Miller.

Jennifer L. Fuschetti (Garriott Maurer, PLLC, on briefs), for Mary
Anne Waddell, f/k/a Mary Waddell Miller.

The Circuit Court of the City of Chesapeake ("trial court") entered a final decree of divorce,

ending the marriage of Matthew G. Miller ("husband") and Mary Anne Waddell ("wife").[1]  On

appeal, husband assigns five errors to the trial court's equitable distribution ruling.  Specifically, he

argues: (1) the trial court improperly placed a burden on husband to prove certain credit card debts

were marital, (2) the trial court erred by failing to classify certain credit card debts as marital, (3) the

---

*This opinion is not designated for publication.  See Code § 17.1-413.

[1] We recognize that "former husband" and "former wife" are more accurate designations,
but we use less cumbersome titles in this memorandum opinion for ease of reference.

trial court improperly "allocate[ed wife a] full share of disposed marital assets as well as simultaneously failing to make her responsible for marital debts by denying [h]usband any credit or recoupment of debt payments he made post-separation," (4) the trial court made a math mistake in calculating the funds remaining from the sale of a particular property, and (5) the trial court improperly classified and distributed wife's separate debt as a marital debt. Wife filed a cross-appeal. She contends that the trial court erred in valuing certain assets, improperly valuing one asset and failing to value other assets. For the following reasons, we affirm the ruling of the trial court.

## I. BACKGROUND

"[W]e view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." *Congdon v. Congdon*, 40 Va. App. 255, 258 (2003).

Husband and wife were married on December 27, 2009, and they separated April 7, 2018.[2] Wife filed for divorce on February 5, 2019. Husband filed a counter-complaint for divorce on February 28, 2019. Both parties sought an equitable distribution of their assets.

In preparation for the hearing, the trial court set out a scheduling order. Among other things, it ordered that the parties designate their expert witnesses ninety days before trial. Husband filed a motion to exclude wife's expert witnesses, arguing that she had failed to appropriately designate experts or expert reports as required. Wife filed a motion to extend the deadline. After hearing argument on the motions, the trial court denied wife's motion to extend the deadline and granted husband's motion to exclude wife's expert witnesses.

The trial commenced September 10, 2020, and the trial court took evidence over six days of hearings between September and November 2020. The parties submitted briefs in lieu of

---

[2] This was the second marriage between the parties. During their first marriage, they had three children together. The parties divorced and then later remarried.

closing arguments. On September 9, 2021, the trial court issued a letter opinion setting out its equitable distribution ruling.

The parties' financial situation was complex. In addition to other significant assets, husband and wife owned, jointly and separately, numerous closely held businesses, some existing before their marriage and some starting during their marriage. Many of these businesses were interrelated, and the trial court noted that the parties' finances were complicated by husband moving money between companies when needed "without formal notes being drafted or notations specifically stating for what purpose the loans were made and when they were to be repaid." Additionally, the trial court noted that the case was further complicated by the fact that wife's expert witnesses were excluded due to her failure to timely designate them and husband's decision not to call any. In resolving the complex issues before it, the trial court was left "largely reliant on the testimony of the husband, without corroboration of accountants, business partners, etc." The following assets and debts are those relevant to the issues on appeal.

A. *Assets*

1. Precon Marine and its Interconnected Companies

Husband started Precon Marine in 1992. At the time of the marriage, he owned a 33.3% share, and he acquired an additional interest during the marriage that brought his ownership interest to 50%. Husband's partner in Precon Marine is Doug Fuller. Together, they are partners in several other businesses, which are tied in with the works of Precon Marine. As husband explained at trial, "all these companies revolve around Precon [M]arine."

While Precon Marine had, at times, been a successful entity, at some point during the marriage it ran into financial difficulties. Precon Marine's financial recovery was complicated by the fact that it was unable to secure surety bonds, which prevented the company from obtaining work that requires such a bond. It was unable to secure surety bonds until it paid back

Zurich, the bonding company, approximately $2.5 million. Husband and wife both personally guaranteed the debt to Zurich, and the debt was also collateralized against real property owned by other entities owned by husband, including Waterway Warehouse.

In addition to the Zurich debt, Precon Marine owed Towne Bank a significant amount of money. Husband, Fuller, and Inland Marine, one of husband's other companies, guaranteed the Towne Bank debt. But Precon Marine ultimately defaulted on the debt. Precon Marine and Towne Bank entered into negotiations in an attempt to work through the debt, and they managed to negotiate a forbearance agreement. Part of this agreement included using property owned by Waterway Warehouse, in which husband and Fuller were partners, as collateral for Precon Marine's debt to Towne Bank. Despite the forbearance agreement, Precon Marine could not meet its obligations, and the parties negotiated an extension and modification of the agreement. The extension called for the sale of Waterway Warehouse's assets to satisfy the debt. But Precon Marine and Towne Bank negotiated a solution that would release Waterway Warehouse's assets as collateral when the debt owed to Precon Marine was paid down by $4 million. As a result of this deal, the $4 million debt was "booked" to Waterway Warehouse.

i. *Waterway Warehouse*

Husband acquired a 50% interest in Waterway Warehouse during the marriage. Waterway Warehouse owns parcels of land with buildings on them, and it rents out space to various tenants. Precon Marine is one of Waterway Warehouse's tenants, though it also rented out space to other unrelated entities.

During trial, husband valued Waterway Warehouse's land between $15 million and $16 million, without reduction for debt. Wife also pointed to husband's December 2018 financial statement, which valued his share of Waterway Warehouse at $7.8 million. Husband denied that was the value of his share, and he again stated that the debt had not been accounted for. Both

- 4 -

parties relied on a December 2019 profit and loss sheet to value the company. The profit and loss sheet listed all of Waterway Warehouse's liabilities, including the $4 million debt Precon Marine owed Towne Bank that Waterway Warehouse had taken on its books. The total liabilities, including the Towne Bank Debt, were $13,012,197.24.

Husband argued that the $4 million debt should be included in Waterway Warehouse's liabilities. Wife, on the other hand, argued that the $4 million debt belongs to Precon Marine, Waterway Warehouse is not obligated to pay it, and therefore, it should not be considered in the valuation of Waterway Warehouse. Under her argument, the total liability of Waterway Warehouse was $9,012,197.24. Using the $15 million to $16 million value less the total liabilities, she argued that Waterway Wearhouse was worth $6 million to $7 million, leaving husband's 50% share worth somewhere between $3 million and $3.5 million. Wife also argued that husband owes Waterway Warehouse approximately $1.5 million in shareholder loans. She argued that this amount should be added to the value of Waterway Warehouse.

In its September 2021 letter opinion, the trial court accepted husband's argument. It calculated the value of the entity by accepting husband's value of $15 million[3] and subtracting the liabilities, and it clarified in the divorce decree that it included the $4 million Towne Bank debt in the liabilities. The trial court concluded that the value of the entity was $1,987,802.76. The trial court awarded husband 66.67% and wife 33.33% of the marital share.

The trial court also credited husband's testimony that he owed Waterway Warehouse $1.4 million, though it later modified the exact amount. The trial court concluded that this debt was marital. The trial court allocated the responsibility for that debt 66.67% to husband and

---

[3] During the hearing, husband testified that the value of Waterway Warehouse land, without accounting for liabilities, was $15 million to $16 million. In doing its calculations (value less liabilities), however, the trial court appears to have accepted the $15 million value. Thus, we use that number on appeal.

33.33% to wife. The trial court did not add the $1.4 million husband owed as an asset to increase the value of Waterway Warehouse.

## ii. *KMD Fiber, LLC*

Husband owns KMD Fiber, which owns a 25% share in Metro Marine Fiber Works. Metro Marine owns the underwater fiber that Precon Marine originally laid down. Metro Marine sells or leases the fiber to third parties. Wife attempted to prove the value of KMD Fiber through financial statements prepared by husband. On both a December 2018 financial statement and a May 2019 financial statement, husband listed the value of KMD Fiber as $475,000. During his testimony, however, husband disputed that figure. He testified that he did not have access to the financial statements from Metro Marine, and he explained that he reached the $475,000 figure by looking at the assets of Metro Marine, without considering any of the debt or losses. He pointed to a $1 million debt that had not been factored into the value. Because he did not have access to a profit and loss statement, or any other financial information, husband explained that he could not support the $475,000 figure, nor could he explain exactly why that figure was inaccurate.

In addition to arguing that KMD Fiber was a separate asset, husband argued that wife did not present evidence of the current value (as of trial) of KMD Fiber. He pointed out that wife did not ask for a separate valuation date, and the $475,000 figure was, at best, speculative of KMD Fiber's value in 2018 or 2019. Wife argued that the trial court can and should rely on the evidence of value provided in husband's financial statements, and she argued that husband cannot argue that the trial court did not have evidence of the current value when he could have presented such evidence. The trial court found that it did "not have reliable evidence of value for this asset, let alone reliable evidence of its value at the time of trial."

### iii. *Inland Marine, LLC*

Inland Marine is a company that owns and operates some of the tugboats and barges used by Precon Marine. Husband owned 33% of Inland Marine prior to marriage, and he increased his share to 50% during the marriage. Husband testified that he paid for his increased percentage via a loan from Precon Marine. Because wife was not permitted to introduce experts, she sought to prove the value of Inland Marine using husband's December 2018 financial statement. On the December 2018 statement, husband listed the value of his 50% share of Inland Marine as $340,000. Wife did not mention or otherwise address husband's May 2019 financial statement, which listed the value of his share of Inland Marine as -$81,547.

Husband argued that Inland Marine was his separate property. He also argued there was no evidence of the current value of the company. He pointed out that the December 2018 statement was two years old, it did not show the value as of the date of trial, and wife had not requested an alternate valuation date. Additionally, husband pointed out that Inland Marine was a debtor on a $4 million loan, though that loan would, at some point, be "booked" to Waterway Warehouse. Wife argued that the value on the December 2018 statement was the best evidence of value, and the value came directly from husband. She contended that husband should not be allowed to benefit from his failure to value the business and that he should not be allowed to devalue Inland Marine by a "non-booked debt."

The trial court did not classify the company as marital or separate property. Instead, it found that it did not have evidence of the value of the asset as of the time of trial. Thus, it did not value the company.

### iv. *Coastal Virginia Crane & Rigging, LLC*

Coastal Virginia Crane & Rigging owns the cranes used by Precon Marine, and it also rents out its equipment to third parties. Husband owns a 40% share of this company. Wife

sought to value his share at $106,094 based on husband's May 2019 financial statement. She also pointed to husband's testimony where he agreed that it was his normal process when valuing a company to subtract the liabilities from assets and then divide by his share of the company. Using the December 2019 balance sheet for the company, the value of husband's interest using that method would be $107,276.

Husband testified, however, that the company lost money in 2015, 2016, and 2017. It was profitable in 2018 only because it sold an asset. While the company was profitable in 2019, husband testified that due to COVID-19 and a general downturn in business, the company's revenue in 2020 was down 30%. Furthermore, he argued that wife did not present any evidence of the current value of the asset, nor did she request an alternative valuation date. Husband argued that the trial court did not have evidence of the value as of the date of trial and thus could not value or distribute the asset. The trial court concluded that it could not value the asset.

### 2. Bennett's Creek Investments LLC

Husband owned a 1/3 interest in Bennett's Creek Investments ("Bennett's Creek"), which was formed during the marriage. Shortly before the parties' separation, Bennett's Creek sold an apartment complex, its sole asset. Husband's 1/3 share of the proceeds from the sale was $300,000. From those proceeds, husband used $200,000 to pay back a loan from Waterway Warehouse. Husband also paid Precon Marine $70,000, which was "booked" against a debt he owed to Precon Marine.

Though Bennett's Creek was presumptively marital property, the trial court concluded husband had demonstrated a separate interest in it, and it was therefore hybrid property. The trial court found that the evidence was insufficient to show that the remaining $30,000 (the difference between the sales price and the $270,000 paid on loans) was used to pay marital debt. It then

stated, "The Court will award 66.67% of the remaining funds ($130,000) to the husband and the remainder to the wife."  It did not explain how it reached the number $130,000.

## B.  *Debts*

### 1.  The Mastercard Black and the Delta American Express Credit Cards

At the time of separation, the parties owed $74,470.11 on a Mastercard Black card and $54,798.81 on a Delta American Express card.  The debt on each card was a mix of personal expenses and business expenses.  Neither party disputed that the personal expenses were marital expenses.

The parties agreed that the business expenses on both credit cards related to MDM Motorsports ("MDM"), which was a racing team started by the couple during the marriage.  By the time the parties separated, it had been shut down.  Husband's partner in MDM was an authorized card holder on the Mastercard Black card, and husband testified that any charges attributable to his partner were MDM-related.  During the hearings, husband testified that he started the company during the marriage so that the parties' son could race at a lower cost.  He and wife regularly traveled with the team.  Husband argued that MDM was a marital asset, and therefore any business expenses on its behalf served a marital purpose.  Although wife did initially claim that MDM was marital property, she also argued that the business debts should be attributed to the business entity and not to the couple personally.  She argued that husband had not provided an accounting to indicate what payments were personal expenses and which expenses were business expenses.

Because MDM was shut down and did not have any value, the trial court did not classify it.  The trial court found that the debt on the credit cards, although incurred during the marriage, was, as husband acknowledged at trial, a mix of marital expenses and general business expenses.

Because it was unclear what portion was attributable to each, the trial court concluded that it was unable to divide the debt on either credit card. Husband objected.

2. Post-Separation Payments on the Mortgage, Horse Expenses, and Rehab

Following the parties' separation, husband sold several assets, including both marital and hybrid property. During the hearings and in his post-trial briefing, husband testified about some of the ways he used the proceeds from the sale of the various assets. He said that he used the proceeds from the sale of these assets to pay certain debts, which he argued were marital debts, and included the mortgage on the parties' marital residence, the ongoing expenses for the parties' horses, and the rehab expenses for the parties' son's substance abuse treatment. Husband also claimed that he was entitled to credit or compensation for his post-separation payments on each of these debts. In support, husband introduced his bank records into evidence.

Wife acknowledged husband's post-separation sale of marital assets, but she argued that husband dissipated those assets. She argued that his bank records and testimony were insufficient to demonstrate that he used the proceeds for marital purposes. She pointed out that husband put the proceeds into accounts controlled by him, used the funds as he chose to pay both marital and personal expenses, and continued to make other deposits into and withdrawals from the same accounts. As a result, she contended that the funds were comingled and husband could not trace the payments to marital funds. She also used husband's comingling of funds as support for her argument that he had not adequately traced the post-separation payments to his separate funds.

The trial court addressed each debt separately. It acknowledged that husband purchased the marital residence prior to marriage but noted that husband had conveyed it to husband and wife as tenants by the entirety during their marriage. It ordered the house to be sold, with husband entitled to 66.67% of the equity and wife entitled to 33.33%. The trial court did not

award husband credit for any post-separation payments towards the mortgage, finding he had not proved that all the payments came from his separate funds.

During the separation, husband sold two horses and put the proceeds towards boarding fees. Wife agreed to pay husband $2,500 for his interest in another horse, and the trial court ordered the sale of the final horse. Husband also claimed $54,109 in horse care expenses between the date of separation and trial, and he asked that wife pay half. The trial court declined to reimburse husband for any of the $54,109 in expenses, finding that husband presented insufficient evidence that he used separate funds to pay the expenses. It also ordered the parties to be equally responsible for boarding fees going forward.

Both husband and wife agreed to split the $45,000 cost of their son's substance abuse treatment. Husband submitted his bank records showing that he paid the full cost, and he asked that wife pay half that cost. Wife admitted that she agreed to split the cost, but she argues that husband did not properly trace the funds used to pay that debt. If the funds came from the sale of marital assets, then she would have already paid her share. She contends it was husband's obligation to prove otherwise. The trial court agreed, finding that the evidence was insufficient to show whether husband used separate or marital funds to pay the treatment costs.

### 3. Pawsh

During the marriage, wife started a business called "Pawsh Salon & Boutique." Wife testified that she used her separate funds to start Pawsh, and she explained that those funds came from the sale of shares in a business she owned prior to the marriage. Pawsh obtained a line of credit, which husband personally guaranteed. Husband submitted a loan statement in Pawsh's name, indicating that it owed $29,420.86 as of July 15, 2018. He testified that he alone made payments on the line of credit, even prior to separation. He submitted an August 9, 2020 loan

statement showing he had paid down the debt to $19,169.36. The August 2020 loan statement, however, was in husband and wife's name. Pawsh closed prior to the parties' separation.

Husband argued that Pawsh was wife's separate property, and wife should be solely responsible for the debt. He argued that wife herself claimed Pawsh was her separate asset, and he made the payments only to protect his credit since he had personally guaranteed the loan. He asked to be compensated for the $18,770.07 he had paid on the debt and that wife be entirely responsible for the debt going forward. Wife asserted that although husband claimed the debt was valued at $29,420.86 as of May 14, 2018, he did not submit evidence of it at trial. She claimed that the only evidence of the amount of the debt was the August 9, 2020 statement, and she argued that husband did not submit any proof of payments made. She claimed that it was a marital debt, and she stated that she would accept responsibility for one-half of the debt. The trial court denied husband's request for compensation for his payments for "want of proof." But it did order wife to pay for one-half of the outstanding obligation.

## C. *Proceedings*

After the equitable distribution issues had been resolved, the parties reappeared before the trial court seeking clarification on certain aspects of its equitable distribution ruling. Following the hearing, wife filed a supplemental brief. Husband then filed a statement on a "remaining issue" (whether certain proceeds from the sale of property were an asset of Waterway Warehouse) from the November hearing. On January 7, 2022, the trial court issued a second letter opinion clarifying that "remaining issue" from the November hearing. It then entered the final divorce decree on March 30, 2022, and both parties filed their objections. Both parties appeal various aspects of the trial court's equitable distribution ruling.

## II. ANALYSIS

### A. *Standard of Review*

"In reviewing an equitable distribution award on appeal, we have recognized that the trial court's job is a difficult one, and we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case." *Moran v. Moran*, 29 Va. App. 408, 417 (1999) (quoting *Klein v. Klein*, 11 Va. App. 155, 161 (1990)). Accordingly, we will not overturn an equitable distribution award unless we find "an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award." *Dixon v. Dixon*, 71 Va. App. 709, 717-18 (2020) (quoting *Anthony v. Skolnick-Lozano*, 63 Va. App. 76, 83 (2014)). To the extent we must interpret a statute, it is a question of law that we review de novo. *Tanner v. Commonwealth*, 72 Va. App. 86, 98 (2020).

### B. *The trial court did not misapply Code § 20-107.3 when it considered the credit card debt.*

Husband contends that the trial court made an error of law by misapplying Code § 20-107.3, which concerns the classification of the parties' assets and debts. He argues that the trial court applied the incorrect burden of proof by requiring him to prove that the credit card debt was marital debt when Code § 20-107.3 creates a statutory presumption that debt incurred during the marriage is marital. He contends that the trial court should have presumed the entire credit card debt was marital, and it was wife's burden to prove that the debt or some portion of it was used for a non-marital purpose.

"To begin with, we presume trial judges 'know the law and correctly apply it.'" *Hamad v. Hamad*, 61 Va. App. 593, 602 (2013) (quoting *White v. White*, 56 Va. App. 214, 217 (2010)). "An appellant can rebut the presumption by showing, either by the ruling itself or the reasoning

- 13 -

underlying it, the trial judge misunderstood the governing legal principles." *Id.* (quoting *White*, 56 Va. App. at 217-18).

Husband's argument that the trial court misapplied the law is based entirely on the trial court's citation to *Gilliam v. McGrady*, 279 Va. 703 (2010), in its September 2021 letter opinion. In *Gilliam*, the Supreme Court addressed an earlier version of Code § 20-107.3. The earlier version did not contain a definition of marital debt, and based on that version of the statute, the Court held that there was no presumption as to the classification of debts incurred during a marriage. *Id.* at 710. Since then, the General Assembly amended Code § 20-107.3 to include a definition of marital debt that presumes debt incurred during the marriage is marital. *See* Code § 20-107.3(A)(5). The amended version of the statute supersedes the holding in *Gilliam*. Because of its citation to *Gilliam*, husband contends the trial court misapplied the law by not presuming the credit card debt was marital.

But we will not rely upon a trial court's isolated statements or citations as proof of error without looking at the context in which they were made. *See Damon v. York*, 54 Va. App. 544, 555 (2009) (finding it improper to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied" (quoting *Groves v. Commonwealth*, 50 Va. App. 57, 62 (2007))). Contrary to husband's argument, the trial court did not conclude that there were no presumptions as to classification of the debts. The trial court did not cite, quote, or otherwise rely on *Gilliam*'s holding. The trial court's quote from *Gilliam* is actually the Court in *Gilliam* quoting Code § 20-107.3(C) and (E), which, in part, deal with the apportionment of debt and the factors to consider in doing so. Although the quoted language comes from the earlier version of Code § 20-107.3, the quoted language still exists in identical form in the current version of Code

- 14 -

§ 20-107.3.[4] Thus, despite citing a case that is no longer good law, the statutory provision quoted by the trial court is still good law.

Because we presume the trial court knew the law and applied it correctly, and because the citation to *Gilliam* does not rebut this presumption, we view the trial court's findings with this presumption in mind. While Code § 20-107.3(A)(5) provides that debt incurred during the marriage is presumed marital, it also provides,

> to the extent that a party can show by a preponderance of the evidence that the debt, or a portion thereof, was incurred, or the proceeds secured by incurring the debt were used, in whole or in part, for a nonmarital purpose, the court may designate the entire debt as separate or a portion of the debt as marital and a portion of the debt as separate.

The trial court recognized that the debt was incurred during the marriage, which is a recognition of the presumption that it was marital debt. The trial court went on to note that there were significant business charges on the credit cards and that husband admitted that debt on the credit cards was a mix of personal and business expenses, exactly as wife contended. Thus, it appears the trial court found that wife had met her burden of showing "by a preponderance of the evidence that the debt, or a portion thereof, was incurred . . . in whole or in part, for a nonmarital purpose." Code § 20-107.3(A)(5).

Husband claims that the trial court put the burden on husband because, in husband's words, it found that "*husband* had failed to provide an accounting of which portion of this debt was for marital purposes and which portion of this debt was for 'general business purposes.'" (Emphasis

---

[4] Further, husband's argument relates to the *classification* of debt as either marital or separate. But the provisions of the statute quoted by the trial court refer to the apportionment or distribution of debt after it has been classified. *See Hamad*, 61 Va. App. at 602 (noting "[e]quitable distribution involves three distinct decisions: classification, valuation, and distribution"). Though the statutory rules for classification are different in the two versions of the statute, the factors a trial court considers for distributing debt between the parties remain the same.

added.)  But we do not read isolated statements out of context.  *See Damon*, 54 Va. App. at 555.  Viewing the trial court's statement in context, we disagree with husband's characterization.  The trial court stated that "wife argues that this is husband's separate debt . . . and the husband did not provide an accounting to indicate what payments were encouraged for race team or marital expenses."  Thus, in context, the trial court was simply setting out wife's argument.  It then went on to note that the debt was incurred during the marriage and funded a mix of marital and business expenses.  Viewing the entirety of the trial court's ruling, we find that the trial court did not misapply Code § 20-107.3 and it did not improperly put the burden on husband to prove that the debt was marital.  Accordingly, the trial court did not err.

C.  *Husband's argument for assignment of error 2 does not comply with Rule 5A:20.*

Husband next argues that the trial court erred by refusing to classify the business expenses on the credit cards as marital debt.  He contends that the business expenses, which he attributes to MDM Motor Sports, served a marital purpose and thus should have been classified as marital debt.

"Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.'  Unsupported assertions of error 'do not merit appellate consideration.'"  *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)).  "An appellate court 'is not a depository in which the appellant may dump the burden of argument and research.'"  *Milam v. Milam*, 65 Va. App. 439, 465 (2015) (quoting *Fadness v. Fadness*, 52 Va. App. 833, 850 (2008)).  "To ignore such a rule by addressing the case on the merits would require this court to be an advocate for, as well as the judge of the correctness of, [appellant's] position on the issues he raises."  *Bartley*, 67 Va. App. at 744 (alteration in original) (quoting *Jones*, 51 Va. App. at 734-35).  Accordingly, where we find the failure to adhere to the rule significant, we may treat the issue as waived.  *Id.*

- 16 -

Here, husband quoted only one legal authority for his entire argument: one lone sentence from our opinion in *Gilliam v. McGrady*, 53 Va. App. 476, 484 (2009).[5]  But our opinion was reversed on appeal to the Supreme Court of Virginia.  Furthermore, as noted by husband in his argument for his first assignment of error, the Supreme Court's opinion was also superseded by statute.  Thus, the only legal authority he provided in his argument on this issue is not good law.  Beyond that, husband did not provide any legal authority for what constitutes a marital or nonmarital purpose.  Nor did he provide any case law or other authority indicating other types of expenses that had previously been considered as having a marital purpose.  Thus, we will not "address[] the case on the merits" and become an "advocate" for husband's position.  *Bartley*, 67 Va. App. at 744.  Accordingly, we find the failure to comply with the rule significant and this issue is waived.

### D. *Husband did not provide sufficient evidence to demonstrate the trial court erred by failing to award him credit or compensation for any payments on marital debts.*

Husband assigns error to the trial court's equitable distribution award because he contends that the trial court effectively gave wife a double share of funds by "allocating her [a] full share of disposed marital assets as well as simultaneously failing to make her responsible for marital debts by denying [h]usband any credit or recoupment of debt payments he made post-separation."  The marital debts at issue, as described above, are mortgage payments on the marital residence,[6] expenses for the parties' horses, and the cost of rehab for the parties' son.  Although husband's assignment of error seems to focus on recoupment of post-separation payments for these debts, his argument boils down to two alternative arguments, either: (1) he used marital funds from the sale of

---

[5] Husband's citation to our opinion in *Gilliam* does include the sources that we cited in *Gilliam*.  But he does not provide legal principles or arguments based on those authorities.  They are included solely as part of a proper citation to *Gilliam*.

[6] Wife also filed a motion to strike this assignment of error as it relates to the mortgage on the marital residence.  That motion is denied.

marital assets to pay the marital debts and wife should not get both a share of the proceeds and no responsibility for a share of the debt, or (2) he used separate funds to pay the marital debts and he should be entitled to a credit or compensation for those payments.[7] Both of these arguments fail.

Husband's first argument seems to presume that he and wife are both entitled to an equal share of the marital assets and an equal division of the marital debts. But it is well settled that "[e]quitable distribution does not mean equal distribution." *Budnick v. Budnick*, 42 Va. App. 823, 838 (2004). There is no presumption of equal division of assets or debts under Virginia law. *Rinaldi v. Rinaldi*, 53 Va. App. 61, 76 (2008). "It is within the discretion of the court to make an equal division or to make a substantially disparate division of assets as the factors outlined in Code § 20-107.3(E) require." *Id.* (quoting *Matthews v. Matthews*, 26 Va. App. 638, 645 (1998)). This same rule applies to the division of debts. Code § 20-107.3(C). Thus, there is nothing inherently wrong with wife receiving a share of marital assets without also receiving an equal responsibility for marital debt, provided the trial court properly considers the factors in Code § 20-107.3(E). There is nothing here to suggest that it did not do so.[8]

Husband's second argument also fails. Much like when a party claims a separate interest in an asset, the party seeking compensation for post-separation payments must establish the amount paid and directly trace that payment to a source of separate funds. *See Gilman v. Gilman*, 32 Va. App. 104, 122 (2000) ("[A] party must (1) establish the identity of a portion of hybrid property and (2) directly trace that portion to a separate asset." (quoting *Rahbaran v. Rahbaran*,

---

[7] For each debt, husband also argues that the trial court failed to classify the debts as marital as required by Code § 20-107.3. Assuming without deciding that this argument is preserved, we note that the trial court did, in fact, conclude that these debts were marital. Although it did not expressly classify them as such, it is clear from its letter opinion that it did so. For example, the trial court ordered wife to pay an equal share of the boarding expenses for the parties' horses from the trial date forward.

[8] We also note that despite being responsible for all the debt, husband also received 2/3 of the assets, while wife only received 1/3.

- 18 -

26 Va. App. 195, 208 (1997))).  The trial court found that the evidence was insufficient to show whether husband used marital funds or separate funds to pay off the debts, and therefore, it refused to award him credit or compensation for those payments.  We agree that husband did not provide sufficient evidence to trace the payments to separate funds.

Although husband submitted his bank records and invoices, husband did not, and perhaps cannot, account for the source of the funds in the account used to pay each of the debts.  Proving the source of funds upon initial deposit may be simple enough, but when the funds are withdrawn or transferred, it can be more difficult.  *See Robbins v. Robbins*, 48 Va. App. 466, 477 (2006).  Husband has a long practice of moving funds between his various businesses and accounts with little clear accounting.  Despite the provided bank statements,[9] the source of funds cannot be clearly traced to separate funds.  Husband's post-separation paychecks were not deposited into the same bank account used to pay each of the three debts.  While husband testified that he would transfer money into the bank account to cover expenses, those transfers come from accounts that also have untraced sources of income.  Moreover, there are numerous unexplained deposits and transfers from his other accounts into the account used to pay his bills.  Consequently, husband has not provided sufficient evidence to prove that he made the post-separation payments on the debts from separate funds.  And even if he had, the trial court is required to consider post-separation payments, but it is not required to "award a corresponding

_____

[9] On brief, husband broadly cites pages "3167-3962" of the record as the location of the evidence of his post-separation payments from his separate funds.  This 800-page range includes records from multiple different banks, over an extended period of time, with no reference to which accounts his payments came from.  "Appellate courts are not unlit rooms where attorneys may wander blindly about, hoping to stumble upon a reversible error."  *Fadness*, 52 Va. App. at 851.  It is "well established that a litigant on appeal has the burden of showing that reversible error was committed."  *Burke v. Catawba Hosp.*, 59 Va. App. 828, 838 (2012).  "Simply put, '[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her . . . .'"  *Bartley*, 67 Va. App. at 746 (alteration in original) (quoting *Sneed v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)).

dollar-for-dollar credit for such contributions." *von Raab v. von Raab*, 26 Va. App. 239, 250 (1997). Accordingly, the trial court did not err in its refusal to compensate husband for such payments.

E. *Husband failed to preserve his argument that the trial court made a math mistake.*

In his fourth assignment of error, husband contends that the trial court made either a math mistake or a clerical error in distributing the proceeds from the sale of the Bennett's Creek property.

But Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." "This rule '"require[s] that objections be promptly brought to the attention of the trial court with sufficient specificity that the alleged error can be dealt with and timely addressed and corrected when necessary."'" *Scott v. Commonwealth*, 58 Va. App. 35, 44 (2011) (alteration in original) (quoting *Bazemore v. Commonwealth*, 42 Va. App. 203, 218 (2004) (en banc)). The purpose of requiring a sufficiently specific objection "is to afford the trial judge a fair opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals." *Quyen Vinh Phan Le v. Commonwealth*, 65 Va. App. 66, 73 (2015) (quoting *Rodriquez v. Commonwealth*, 18 Va. App. 277, 284 (1994)).

Husband did make a general objection "to the net equitable distribution amount the [c]ourt ruled is owed to wife," contending that it was improperly calculated. But an objection to the calculation of the entire award is insufficient to point the trial court to an alleged math or clerical mistake related to a particular asset, and, during oral argument before this Court, husband conceded that the issue was not properly preserved. Because this issue is not properly preserved, we do not consider it now on appeal. *See Quyen Vinh Phan Le*, 65 Va. App. at 73 ("[T]he Court of Appeals will not consider an argument on appeal which was not presented to the trial court." (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998))).

F. *Husband assumed responsibility for wife's separate Pawsh debt by refinancing wife's separate business loan into his name.*

In his final assignment of error, husband argues that the trial court "abused its discretion in the distribution of wife's line of credit for her separate business, Pawsh." He contends that Pawsh was wife's separate property, and therefore Pawsh's debt should have been classified as wife's separate debt. We decline to address this issue, finding that whether the debt was separate at the time of the parties' separation is moot. *See Godlove v. Rothstein*, 300 Va. 437, 439 (2022) ("A question is moot when 'the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" (quoting *Bd. of Supervisors v. Ratcliff*, 298 Va. 622, 622 (2020))).

Assuming without deciding that the debt was separate at the time the parties separated, husband has since voluntarily assumed responsibility for the debt. In the initial August 31, 2018 loan statement, the line of credit is in the name of Pawsh Salon & Boutique, LLC. In the statement from August 9, 2020, the line of credit is in the name of Matthew G. Miller and Mary W. Miller. At some point after the parties separated, husband voluntarily assumed responsibility for the debt when it was renegotiated into the names of both parties.

This is unlike *Price v. Peek*, 72 Va. App. 640 (2020), where we concluded that a post-marital refinance did not change the classification of a debt. In *Price*, the debt was classified as marital, and the parties' separation agreement made the husband responsible for the debt. *Id.* at 648. When the husband encountered difficulties, the wife agreed to refinance the loan through a new institution. *Id.* This Court rejected the husband's argument that the refinancing extinguished his separate obligation under the separation agreement and replaced it with a joint obligation, and it held that the refinance did not change the classification of the debt. *Id.* at 649.

- 21 -

In *Price*, the parties refinanced a marital debt to assist the husband in fulfilling the obligation under the separation agreement. It was the transfer of a marital debt to a different institution. Here, husband assumed responsibility for paying the debt when he agreed to refinance wife's business debt into his name. It was the transfer of an allegedly separate debt into a joint debt after the date of the parties' separation. There is nothing in the record that indicates husband's refinance of the debt into his name was involuntary. Though husband contends he paid the debt to avoid it affecting his credit, since he had personally guaranteed it, this did not require him to transfer the debt into his name. As such, we need not address whether the trial court erred.

G. *The trial court's valuation of Waterway Warehouse was not contrary to the evidence.*

Wife argues that the trial court erred in valuing Waterway Warehouse. Her main argument is that the trial court erred by including the $4 million Towne Bank debt, which Precon Marine owed, as a debt of Waterway Warehouse in calculating the value of Waterway Warehouse.[10] She

---

[10] One of wife's arguments in support of this point is that there was a $4 million note payable that Precon Marine owed Waterway Warehouse. She contends that this note payable was an asset that offset the Towne Bank debt on the books. But "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Wife did not raise this argument below. Wife submitted a written statement in lieu of a transcript for the November 2022 hearing. In it, this argument was listed as one of the arguments wife made. The trial court, however, specifically crossed out this statement, and it noted that it did not have any "notes reflecting this argument." Wife also contends that her objection to the final decree was sufficient because she stated, "there was no evidence that Waterway Warehouse would be called upon to actually pay the debt." But whether someone is called to pay a debt and whether a note payable can be called in to offset that debt is a different argument. *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc) ("Making one specific argument on an issue does not preserve a separate legal point on the same issue for review."). Accordingly, we do not address this argument.

also argues that the trial court erred by not adding to the value the amount husband owes in shareholder loans.[11] We disagree.

The value of property is an issue of fact, and we are bound by the trial court's finding "unless it is plainly wrong or without evidence to support it." *Patel v. Patel*, 61 Va. App. 714, 722 (2013). Courts in Virginia "look to the intrinsic value of the property to the parties to measure value for equitable distribution purposes." *Hoebelheinrich v. Hoebelheinrich*, 43 Va. App. 543, 550 (2004). "Intrinsic value is a very subjective concept that looks to the worth of the property to the parties." *Howell v. Howell*, 31 Va. App. 332, 339 (2000). Consequently, "the particular method of valuing and the precise application of that method to the singular facts of the case must vary with the myriad situations that exist among married couples." *Hoebelheinrich*, 43 Va. App. at 550-51 (quoting *Howell*, 31 Va. App. at 339).

Wife points to *Patel*, where this Court approved a trial court giving a marital property encumbered with more debt than its value a zero value rather than a negative value, which would decrease the value of the marital estate. 61 Va. App. at 725. She contends that rule should equally apply in a case like here, where debt from a separate property (Precon Marine) is being used to lower the value of marital property (Waterway Warehouse).

But the facts in *Patel* are distinguishable from the facts of this case. In *Patel*, each of the companies ran separate from the others. There is nothing to suggest that the companies were

---

[11] Husband contends that this issue is not preserved. We disagree. In the written statement from the November 2022 hearing, it states that "Counsel for Wife further argued that if the court found that the debt had been proved, then the debt should also be considered an asset of the company for the purposes of valuing the company." When we do not have transcripts of what occurred, we are left to rely on the written statement of facts. Despite husband's objection, the trial court did not alter or remove this statement. Thus, it appears the trial court had the opportunity to rule upon the objection. *Murillo-Rodriquez v. Commonwealth*, 279 Va. 64, 79 (2010) (noting that the "primary purpose of requiring timely and specific objections is to allow the trial court an opportunity to rule intelligently on the issues presented, thereby avoiding unnecessary appeals and reversals" (quoting *Shelton v. Commonwealth*, 274 Va. 121, 126 (2007))). Accordingly, we find that the argument is properly preserved.

intertwined or dependent on each other. Here, many of the companies were created with the distinct purpose of supporting Precon Marine. Further, husband moved money and assets between the companies as needed, with little formal accounting. He also used assets from some of his companies as collateral for loans to his other companies. This was done throughout the entirety of the marriage. The value of husband's companies is inextricably intertwined with the value and debts of his other companies.

Further, unlike in *Patel*, the debt here was not speculative. In *Patel*, the husband argued he was personally liable for debts, and he would be required to pay if the companies went out of business. *Id.* at 726. This Court rejected that argument, noting that there was no evidence any of the companies had defaulted on the loans. *Id.* at 727. Here, Precon Marine had already defaulted on the Towne Bank debt. Only forbearance agreements, and ongoing negotiations, prevented Towne Bank from collecting against Waterway Warehouse, which was collateral for Precon Marine's loans.

When deciding the intrinsic worth of the property to the parties, the trial court must look to the "facts of the case" and the "myriad situations that exist among married couples." *Hoebelheinrich*, 43 Va. App. at 550-51 (quoting *Howell*, 31 Va. App. at 339). Here, the trial court heard evidence that money was constantly and informally being transferred between companies. It also heard evidence that the $4 million Towne Bank debt, though owed by Precon Marine, was collateralized with Waterway Warehouse's property. It heard evidence that the debt was in default, and only successive forbearance agreements, including terms involving Waterway Warehouse, prevented the loan from being collected against Waterway Warehouse's assets. As far as the shareholder loans, the trial court specifically noted its difficulty with this case because husband transferred assets between the companies "without formal notes being

drafted or notations specifically stating for what purpose the loans were made and when they were to be repaid."

Moreover, wife did not comply with the scheduling order and was not able to provide expert testimony to assist the trial court in coming to a "better" value of the company. *See Reaves v. Tucker*, 67 Va. App. 719, 738 n.10 (2017) ("[T]he burden is always on the parties to present sufficient evidence to provide the basis on which a proper determination can be made." (alteration in original) (quoting *Bowers v. Bowers*, 4 Va. App. 610, 617 (1987))). The trial court was left "largely reliant on the testimony of the husband, without corroboration of accountants, business partners, etc." Given the complexity of the situation and the nature of the evidence before it, the trial court was left to do its best in valuing Waterway Warehouse. The trial court was not plainly wrong in including the Towne Bank debt and excluding the shareholder loan from the value of Waterway Warehouse. Accordingly, the trial court's valuation of Waterway Warehouse was not contrary to the evidence.

H. *The trial court did not err when it did not value KMD Fiber, Coastal Virginia Crane & Rigging, and Inland Marine.*

Wife argues that the "trial court erred in its equitable distribution award because it failed to value" KMD Fiber, Coastal Virginia Crane & Rigging, and Inland Marine. We disagree.

The trial court is required to "'determine from the evidence that value which represents the property's intrinsic worth' to the parties." *Wright v. Wright*, 61 Va. App. 432, 457 (2013) (quoting *Bosserman v. Bosserman*, 9 Va. App. 1, 6 (1984)). But Code § 20-107.3(A) requires the trial court to "determine the value of any such property as of the date of the evidentiary hearing on the evaluation issue." If either party makes a motion "no less than 21 days before the evidentiary hearing," then "the court may, for good cause shown, in order to attain the ends of justice, order that a different valuation date be used." Code § 20-107.3(A). Using a date as near as practicable to the date of trial "will provide the Court with the most current and accurate information

available which avoids inequitable results." *Wright*, 61 Va. App. at 463 (quoting *Gaynor v. Hird*, 11 Va. App. 588, 593 (1991)).

Here, wife did not request a different valuation date, nor did she present the trial court with "good cause" for using a different date. Thus, the trial court was bound by statute to value the companies as of the date of the evidentiary hearing. The trial court's conclusion that it did not have sufficient reliable evidence to value the companies as of the date of the hearing is supported by the record. In this case, the trial court conducted the evidentiary hearing over six dates from September 2020 to November 2020. Wife's evidence of value was based on old information, some of which was nearly two years out of date, coming primarily from husband's financial statements from December 2018 and May 2019.

Furthermore, in reviewing those financial statements, the trial court could see that the values of the companies varied drastically in just the few months between December and May. More specifically, the December 2018 value of Inland Marine was $340,000, while the May 2019 value was -$81,457. There was also testimony about why the financial statement values of each company should not be used. Husband testified that the financial statement value of KMD Fiber was not accurate because it did not account for the company's debt. Husband also testified that Coastal Virginia Crane & Rigging was expecting losses due to both the COVID-19 pandemic and a general business downturn, and it had experienced a 30% decrease in revenue. Thus, the trial court did not err in concluding that it had neither sufficient nor reliable evidence to value the companies as of the date of the evidentiary hearing.

Wife acknowledges that a trial court cannot prefer an earlier valuation when a recent one it available. But she relies on *Hamad*, to argue that the trial court is permitted to use "the earlier valuation information to determine the current asset value when the earlier data is all that is available to the court."

In *Hamad*, the trial court was valuing and dividing two joint bank accounts. The parties submitted bank statements reflecting the value of the accounts around the time the parties took depositions, which was approximately six months before the evidentiary hearing. *Hamad*, 61 Va. App. at 599. Both parties agreed, and the trial court acknowledged, that the assets had to be valued as of the date of the hearing. *Id.* at 608. But neither party provided the trial court with evidence of the updated account values. *Id.* The trial court valued and divided the accounts based on the values in the bank statements. *Id.* at 609. This Court concluded that the trial court did not err in doing so because it "did not make a conscious decision to *favor* the account balances presented during the depositions and *disfavor* more current information presented at the evidentiary hearing. There simply was no more current information." *Id.*

While *Hamad*'s holding may have supported the trial court had it used the financial statements to determine the current value of the companies, *Hamad* does not require it to have done so, particularly where, as here, the trial court found that the evidence of value was not reliable. The evidence in *Hamad* was bank documents. By comparison, the evidence in this case was financial statements prepared by husband, whose own testimony contested the accuracy and reliability of the valuations in those statements. *See Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005) ("[G]reat deference must be given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." (quoting *Walton v. Commonwealth*, 255 Va. 422, 426 (1998))). Thus, *Hamad* did not require the trial court to rely on the earlier valuations. Accordingly, we find that the trial court did not err in finding that the evidence was unreliable and insufficient to determine the value of the companies at the time of the hearing.

## III. Conclusion

For the foregoing reasons, we affirm the ruling of the trial court.

*Affirmed.*